UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )
v.                       )    Case No. 03 CR 10363 RCL
                         )
CHUONG VAN DUONG         )
Defendant                )

### AFFIDAVIT OF SPECIAL AGENT ANN COTELLESSO
### IN SUPPORT OF PRETRIAL DETENTION

I, Ann Cotellesso, being duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.     I am a Special Agent with the Internal Revenue Service, Criminal Investigation (IRS), and have been so employed since December 1995. Since March 2003, I have been involved in an investigation of an investment fraud scheme involving Chuong Van Duong ("Duong") operating as Asia Golden Dragon Corporation ("AGDC"), which includes mail fraud, money laundering and structuring. In my capacity as an IRS Special Agent, I have participated in numerous mail fraud, money laundering and structuring investigations during the course of which I have conducted financial analyses of bank records and other financial documents, physical and electronic surveillance, and executions of search warrants. Through my training, education and experience, I have become familiar with the manner in which the proceeds of specified unlawful activity are laundered and the efforts of persons involved in such activity to avoid detection by law enforcement.

2.     I am submitting this affidavit for the limited purpose of supporting the government's motion for pretrial detention of Duong, who has been charged in an Indictment

1


FILED
In Open Court
USDC, Mass.
Date 1-8-04
By [signature]
Deputy Clerk



with fourteen counts of mail fraud (18 U.S.C. §1341), nine counts of money laundering (18 U.S.C. §1956(a)), and five counts of structuring financial transactions (31 U.S.C. §§5324(a)(3)).

3. I have included in this Affidavit only those facts which set forth the information necessary to support the government's motion. These facts are either personally known to me, or have been related to me by other federal, state, or local law enforcement officers or employees. Accordingly, this Affidavit does not contain all of the information known to me regarding this criminal investigation.

## FACTS AND CIRCUMSTANCES OF THE CHARGES AND WEIGHT OF THE EVIDENCE

3. The following paragraphs regarding the facts and circumstances of the charges against the defendant demonstrate that the government has a strong case and the weight of the evidence is against the defendant:

**Mail Fraud**

4. Based upon interviews of and documents received from more than ten individuals who invested with Duong ("investors") and at least one individual who worked with Duong, consensual recordings of conversations between Duong and several of these investors, and a recorded meeting between Duong and an undercover agent of the FBI (UCA), the investigation has revealed the following: From in or about 1996 to the present, Duong engaged in a scheme to defraud numerous persons by inducing such persons to give him money for investment in his international import-export businesses by means of false representations and promises. Although the specific representations varied from investor to investor, in general, Duong told so-called "investors" that he was the President of Asia Golden Dragon Corporation (AGDC) and the owner

of numerous other companies that were involved in the international business of importing and exporting products and commodities, such as garments, rice, sugar, fertilizer, jewelry, etc. He falsely told investors that he had been successful in these businesses for many years and had made a lot of money. He falsely promised the investors that they would earn large sums of money on their investments in a short period of time. He also promised that he would use the investors' money for investments, e.g. contracts and bonds, when in fact, he spent it for his own purposes, converting much of the funds to cash. Duong told these victims that he would allow them to participate in his business and share in his large profits if they invested with him. Some victims were told they were investing in one or more of his companies, others understood they were investing in contracts, while others believed they were investing in a bond necessary to perform such contracts. Duong showed his victims what he represented to be his company's contracts, including contracts for the sale of commodities, such as rice and sugar, and contracts for the manufacture and sale of garments. Duong also had his investors sign contracts, thereby making it appear as if they were actually parties to the contracts. Duong had the investors incorporate their own companies and open corporate bank accounts in order to participate in the business and receive the profit when it was paid. Duong showed the investors false bank documents to demonstrate that he had access to millions of dollars and gave the investors contracts and other documents relating to their investments.

5. The investigation has revealed that Duong incorporated and used AGDC and several other corporations for the purported purpose of engaging in various international import-export businesses and used these corporations in his scheme to defraud. The other corporations used by Duong include: Global Garment Exchange Internet Corporation ("Global Garment"),

International Diamond & Gem Corporation ("Diamond and Gem") and Fifth Continental Capital Group Financial Corporation ("Fifth Continental"), as well as others. Additionally, Duong has recently incorporated three new corporations, International Fashion and Garment Association ("Fashion and Garment"), International Help Charities Corporation ("Help Charities"), and International Recycle Investment Group Import and Export Corporation ("Recycle Investment") which, based upon the information and belief, Duong is presently using in his fraudulent scheme to induce individuals to invest with him.

6. To date, the investigation has identified ten investors who have been defrauded of over $225,000 by Duong. Duong has never returned any money to such investors, but rather used it for his own purposes, converting approximately half of such investor funds to cash.

7. The investigation, and the bank records discussed below, have further revealed that from January 2001 to the present, at least eight other individuals gave Duong large sums of money and incorporated corporations which Duong has represented are associated with AGDC. The money received from such individuals was deposited into Duong's personal account, into the account held in the name of Diamond and Gem at Citizen's Bank, or into the account held in the name of Global Garment at Citizen's Bank. Since Duong's arrest, these individuals are being contacted to confirm that they have invested with Duong and are victims of his fraudulent scheme. The deposits into Duong's bank accounts from these suspected victims of Duong's scheme total approximately $300,000; at least $111,000 of such funds were converted to cash. I have reviewed and analyzed the records of bank accounts held by Duong personally and in the names of his various corporations. The bank records I reviewed revealed that during the period from December 27, 1995 to the present, Duong had at least seven different bank accounts in the

4

name of AGDC:

- Fleet Bank A/C XXXXXX-0388 open from 12/31/95 to 6/30/99

- BankBoston A/C XXX-X4388 open from 12/27/95 to 3/28/00

- Fleet Bank A/C XXXXXX-1145 open from 3/13/00 to 6/16/00

- Citizen's Bank A/C XXXXXX-739-0 open from 9/7/00 to 9/30/01

- Citibank A/C XXX6064 from 9/25/00 to 10/23/00

- Sovereign Bank A/C XXXXXXX5123 open from 6/17/00 to 7/31/00

- J.P. Morgan Chase A/C XXX-XXXXX77-65 open from 5/01 to 9/02
  J.P. Morgan Chase A/C XXX-XXXXX61-65 from 11/02 to present.

The bank records also revealed that during the period from January 27, 1998 to the present, Duong used three personal accounts in his own name at three different banks:

- BankBoston A/C XXX-X2199 open from 1/27/98 to 10/11/01

- Citizen's Bank A/C XXXXXX-581-9 open from 6/8/00 to 5/29/01

- Asian American Bank A/C XXXXX4490 from 4/24/02 to the present

The bank records further showed that from May 15, 2001 to the present, Duong also used an account in the name of International Diamond at Citizen's Bank, A/C XXXXXX-778-8; he used this account to conduct the limited activities of his small jewelry store, as well for conducting transactions with the money he obtained from investors. The bank records also showed that from January 2, 2001 to June 13, 2001, Duong and Chang also used a bank account in the name of Global Garment at Citizen's Bank A/C XXXXX-929-4. The bank records also showed that an account was opened at Sovereign Bank, A/C XXXXXXX1997, in the name of H&T by J.H.N. and H.T., associates of Duong. These bank records also show that apart from

investment funds received from investors and some currency deposits, Duong and his corporations did not earn any significant income, except for some limited income earned by Diamond and Gem related to jewelry sales.

8. On July 28, 2003, a Special Agent of the FBI, acting in an undercover capacity as an employee of State Street Bank met with Duong. The meeting was conducted in Vietnamese and English and was recorded. The Vietnamese portions of the tape were translated. I have reviewed the translated transcript of this meeting. During the meeting, Duong told the UCA that he wanted to open an account at State Street in order to transfer one billion dollars of foreign currency from Jakarta, Indonesia to the United States. Duong represented to the UCA that he was doing business with the Indonesian government in connection with recycled products. In connection with this business and investment, Duong gave the UCA various documents, including a UBS Bank Guarantee for $1,000,000,000.00 (One Billion Dollars) and a UBS Bank Guarantee for $20,000,000,000.00 (20 Billion Dollars). These UBS bank guarantees had previously been produced to State Street Bank, which had forwarded them to UBS to confirm their authenticity. UBS Switzerland reported that they were counterfeit instruments. Duong told the UCA that the documents from the Indonesian government are top secret and confidential and that they include the PINs for all of Indonesia's money and its gold and silver reserve that are deposited at UBS Switzerland.

9. Duong represented himself to the UCA as the President of AGDC and gave the UCA a pamphlet of AGDC, describing the business of AGDC and US Group AGDC and identifying by name, logo and business description all of AGDC's Affiliated Companies, International Joint Venture Companies, and Branch Companies, a total of 18 companies. Duong

and his associates described Duong's business as a general combination of both import and export, in garments, commodities, rice, cement, sugar and fertilizer. *When asked about the revenue generated by AGDC over the last five years, Duong stated that in the past five years, they did not make any profit and did not really do any business. He said that during the last five years, they were only marketing and organizing and that this was their first business venture.*

10. When asked about where the money for expenses comes from, Duong told the UCA that people worked with him in a partnership role in his corporations. Duong stated that these people each invested in their own company which are not related to AGDC. His associate, J.C., stated that these individuals are not shareholders in AGDC, but they invested by a branch company and became their franchises.

11. When asked how future deposit/withdrawals would be made from the account, Duong stated, "We want to do it by wire or check. . . . We will not use much cash here." His lawyer, K.D.V., reiterated, "We will not use much cash. We do not have access to cash and we would prefer not to deal with cash."

12. Duong stated that 90% of his investors that gave him money are in the U.S. He told the UCA that they were solicited by the internet; they looked him up on the internet and asked to do business with him. Duong told the UCA: "that means I formed such a net, and have signed all the contracts. So now I launch the business. . . . And during this past time, I have traveled to the countries in the world, and have met with the big leaders of these countries . . . including the Prime Minister of Vietnam, the Vice Chairman of China, and other ministers in China." Duong stated that the investors gave only a couple tens of thousand dollars and they will have no claim to the money when it comes in from Indonesia because it is a separate

7

transaction. He told the UCA: "this is different! Because they did different transaction with me, signed a different contract. They have absolutely nothing to do with this transaction - no involvement with it."

**Money Laundering**

13.     The bank records reveal that Duong deposited the funds he received from investors into different bank accounts he controlled, rather than the same account. The records also show that Duong deposited funds from investors into accounts held in corporate names as well as personal accounts and then withdrew the funds by checks payable to himself, and cashed them. The bank records reveal the following regarding the disposition of funds Duong received from known investors:

a) Duong deposited the $30,000 that he received from Ut Vuong into an account in the name of AGDC at BankBoston. Duong negotiated $8,000 of these funds to currency and also used the funds to pay various personal and business expenses.

b) Duong deposited the money he received from Dinh Nguyen into his personal account at Bank of Boston. Duong or others on his behalf negotiated the following amounts to cash: $9,000; $7,000; $3,500; $9,000; $8,000; $4,000; $7,000; and $2,000.

c) On September 21, 1999, Duong deposited the $20,000 he received from Henry Van Le into the A.G.D.C. account at BankBoston which had a balance of $579.00 at the time; these funds were then withdrawn by Duong by means of 4 checks from November 18 through December 23, 1999. Three of these checks made payable to Duong himself for the following amounts were negotiated to cash: $1,100; $5,000 and $9,000. One of these checks for $2,000 made payable to K.D.V., a lawyer who represents Duong personally and in connection with these

businesses, was negotiated to cash by K.D.V.

d) Thinh Dao gave J.H.N. a total of $21,000 in checks. These checks were deposited into an account in the name of H&T at Sovereign Bank. This money was used to purchase two Sovereign Bank checks in amounts of $5,000 and $15,000. Duong negotiated the $5,000 bank check into his personal account at Citizen's Bank and the $15,000 bank check into the AGDC corporate account at Citizen's Bank. Duong used these proceeds to pay various personal and business related expenses.

e) Duong deposited the $30,000 he received from Tommy Tran into the account of Diamond and Gem at Citizen's Bank which had a balance of $571.00 at the time. These funds were then withdrawn it by Duong by means of three checks for $9,000, each payable to Duong himself which are negotiated to cash on August 6, August 8, and August 12, 2002.

f) Duong deposited $10,000 in checks that he received from Judy Nguyen into the account of Diamond and Gem. On June 4, 2002, Duong deposited an $8,000 check he received from Judy Nguyen into the Diamond and Gem account which had a balance of $584.00 at the time. On June 7, 2003, Duong withdrew these funds by a check payable to himself for $7,800, which he negotiates to cash.

14. The foregoing transactions reveal that Duong conducted financial transactions with the proceeds of a specified unlawful activity, to wit, mail fraud in violation of 18 U.S.C. §1341, knowing that the property was the proceeds of unlawful activity and the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of said specified unlawful activity, in violation of 18 U.S.C. §1956(a).

## Structuring Financial Transactions

15.     My analysis of the bank records revealed that Duong has structured currency transactions to avoid the currency reporting requirements by withdrawing sums greater than $10,000 by means of checks in amounts less than $10,000 payable to himself or one of his associates, which were thereafter cashed over several days, in violation of 31 U.S.C. §5324(a)(3).

16.     On September 20, 2001, Duong withdrew a total of $13,000 from his Diamond and Gem account by means of two checks, one in the amount of $8,000 payable to himself and the other in the amount of $5,000 payable to Vo, which checks were both cashed on September 20, 2001.

17.     From August 6 through August 9, 2002, Chuong withdrew a total of $27,000 from his Diamond and Gem account by means of three checks made payable to himself, each in the amount of $9,000, which were cashed on August 6, August 8 and August 9, 2002.

18.     On April 28, 2003, a Bank of New Hampshire check in the amount of $50,000 was deposited into Duong's personal account at Asian American Bank. This bank check was purchased from Bank of New Hampshire by David Vu.

19.     From May 7 through May 9, 2003, Duong withdrew a total of $27,000 from his personal account at Asian American Bank by means of three checks in the amount of $9,000, each made payable to himself, which were cashed on May 7, May 8 and May 9, 2003.

20.     From May 12 through May 15, 2003, Duong withdrew a total of $22,500 from his personal account at Asian American Bank by means of two checks in the amount of $9,000 and one check in the amount of $4,500, each made payable to himself, which were cashed on May 12, May 14 and May 15, 2003.

20. On August 14, 2003, a check in the amount of $40,000 from Them Thi Tran, the mother of David Vu, was deposited into Duong's Diamond and Gem account.

21. From August 18 though August 22, 2003, Duong withdrew a total of $27,000 from his Diamond and Gem account by means of three checks in the amount of $9,000, each made payable to himself, which were cashed on August 18, August 21, and August 22, 2003.

### Other Financial Transactions

22. The bank records also reveal additional deposits of large sums of money from individuals:

23. On October 18, 2003, a check in the amount of $31,000 was deposited into the Diamond and Gem account at Citizen's Bank. This bank check was made payable to International Diamond and Gem by an unknown purchaser.

24. On October 25, 2003, a bank check in the amount of $31,335.68 was deposited into the Diamond and Gem account at Citizen's Bank. This bank check was made payable to David Vu and was endorsed by Vu and Duong. On November 17, 2003, the Diamond and Gem account at Citizen's Bank was closed.

25. Additionally, in July 2003, David Vu provided Duong with three bank checks totaling $60,000. Duong used these bank checks to purchase $55,000 in diamonds from a local diamond merchant.

26. As the foregoing demonstrates, Duong has received significant funds, the whereabouts of which is unknown. The bank accounts reveal that since April 2003, Duong has received at least $167,000, in addition to the $60,000 from David vu that he used to purchase diamonds. Duong, therefore, has access to significant resources that he could use to flee.

## HISTORY AND CHARACTERISTICS OF THE DEFENDANT AND COMMUNITY TIES

### Citizenship and Residence

27.     Based upon information received from Immigration and Customs Enforcement (ICE), Duong is a citizen of Vietnam and a resident alien in the United States. He came to the United States in 1993 and has been in Massachusetts since on or about December 1995. Since 1995, he has had numerous addresses in Massachusetts, including Framingham, Boston, Allston and Quincy. At the time of arrest, he stated that he lined at 200 President's Way, Quincy, MA.

### Lack of Employment

28.     Except for his small jewelry business, which appears to be a front for his fraudulent activity, Duong's only employment is in connection with his purported import-export businesses, which all have been used by him in his fraudulent scheme, and based upon the bank records, have not earned any legitimate income.

### No Family Ties and Failure to Appear at Probate Court Hearings

29.     Based upon information and belief, Duong does not have any family living in the Boston area, except for a child as to whom Duong contested paternity and has been ordered by the court to pay child support. The probate proceedings regarding this child are pending in Norfolk Probate Court. See attached records from the Norfolk Probate and Family Court. The Probate Court records reveal that Duong has been held in contempt for ignoring the court's orders and failing to pay child support. The Probate Court records also show that Duong has failed to appear and that a capias was issued for his arrest. Additionally, the attorney representing the mother of the child reported that on at least one occasion, Duong had access to

12

large amounts of cash.

**Frequent International Travel and Connections**

30. During the course of the scheme from 1996 to the present, Duong has frequently traveled to Vietnam, China, Hong Kong and Indonesia. Individuals who have accompanied Duong on such trips has reported that he meets with many people and appears to have connections in these countries. Duong himself bragged about his international connections to the UCA in their meeting of July 28, 2003. Information received from ICE and observations of FBI agents and myself has revealed the following recent international travel by Duong:

   a) On August 28, 2003, Duong traveled to China via San Fransisco. He returned from China via San Fransisco on September 15, 2003.

   b) On October 5, 2003, Duong departed Boston for Jakarta, Indonesia. He returned on October 15, 2003 via Los Angeles.

   c) On November 18, 2003, Duong returned from Seoul, South Korea, via New York.

   d) Sometime after November 18, 2003, Duong left the United States. Duong returned to Boston on December 15, 2003.

31. Duong's Vietnamese passport also confirms Duong's recent, frequent travel to China, Hong Kong and Indonesia including numerous visas for those countries, as well as a visa for Hong Kong, No. A0152537, that appears to remain valid for one trip until February 21, 2004, and a visa for the People's Republic of China, No. 3120149, issued on August 31, 2003 that appears to remain valid until March 2, 2004.

**Deportation**

32. If convicted of the crimes charged in the Indictment, Duong not only faces a

sentence of incarceration, but also deportation. Under 8 U.S.C. §1227(a)(2)(A)(i), Duong is deportable if he is convicted for a crime involving moral terpitude occurring within ten years of his date of admission (since he has been given permanent resident status) for which a sentence of one year or more may be imposed. Additionally, under 8 U.S.C. §1227(a)(2)(A)(iii), Duong is deportable for committing an aggravated felony. 8 U.S.C. § 1101(a)(43)(M)(i) provides that an offense involving fraud or deceit in which the loss to the victim or victims exceeds $10,000 is an aggravated felony.

## CONCLUSION

33. Based on the foregoing, I believe that there is no condition or combination of conditions for the defendant that will reasonably assure the appearance of the defendant as required.

Respectfully submitted,

ANN COTELLESSO
Special Agent
Internal Revenue Service
Criminal Investigation

Subscribed and sworn to
before me this 8th day of
January, 2004

HON. JOYCE LONDON ALEXANDER
UNITED STATES MAGISTRATE JUDGE