## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | |
| ) | **CRIMINAL NO. 03-10363-RCL** |
| **CHUONG VAN DUONG,** ) | |
| ) | |
| **Defendant.** ) | |

## GOVERNMENT'S TRIAL BRIEF

Comes now the United States of America, by and through the undersigned counsel, and submits herewith its trial brief in the above-captioned matter.

### The Charges Against Chuong Van Duong

The Indictment in this case charges Chuong Van Duong ("Duong")[1] with 14 counts of mail fraud in violation of 18 U.S.C. § 1341 and 5 counts of structuring in violation of 31 U.S.C. § 5324(a)(3).[2]

Beginning in or about 1996 and continuing up until his arrest in December, 2003, Duong is charged with "engag[ing] in a scheme to defraud numerous persons by inducing such persons to give him money for investment in his international import-export businesses by means of false representations and promises." Indictment ¶11. Those false representations and promises included

---

[1]  Public records such as the defendant's immigration file make it clear that Duong is the defendant's family name. Trial exhibits and other documents indicate that Duong has Americanized his name by using his family name as his "last" name. However, the Court should be aware that, in Vietnam, China, and perhaps other Asian nations, a person's family name appears in the first position and his/her given name appears in the final position. The government will strive to anticipate and avoid any confusion this may cause, since some documents may refer to individuals both by their "true" names and by their Americanized names and since some witnesses, such as An Weizhi, a Chinese businessman who dealt with Duong, are known only by their true names (and, consequently, he is properly addressed as "Mr. An," Weizhi being his given name).

[2]  The money laundering counts and criminal forfeiture allegations have been voluntarily dismissed by the government.

telling "investors that he had been successful in these businesses for many years and had made a lot

of money"; telling "the investors that they would earn large sums of money on their investments in

a short period of time"; and "promis[ing] that he would use the investors' money for investments,

when in fact, he converted the money to cash and spent it for his own purposes." Id.[3]

The indictment alleges that Duong, a Vietnamese immigrant himself, "targeted and solicited

money from individuals in the Vietnamese community who had immigrated to the United States,"

many of whom "did not speak or read English or only spoke limited English." ¶12. Duong "varied

the representations he made to investors in order to convince them to give him their money." ¶18.

For instance, Duong told some investors that

> he had access to a large sum of money transferred from China to banks in the United
> States by Chinese Generals and that he could get this money released if he raised
> enough money for a bond. DUONG told such investors that if they gave him money
> for the bond, he would give them a significant share of the money held in United

---

[3] The indictment also contains allegations which reflect minor variations on the basic themes alleged in ¶ 11. Thus, Duong is alleged to have "presented himself as an educated and successful businessman who made money through business in America and was knowledgeable about such matters" (¶12); he used various companies (identified below) "to make it appear to potential investors that he was in fact engaged in such businesses and was legitimate and successful, when in fact, with [one] exception . . ., DUONG knew that these corporations were merely shells that had no legitimate business income or assets and did not conduct legitimate business activities" (¶13); it is alleged that the websites maintained and the literature produced by Duong "were part of the scheme in that they made DUONG's businesses appear to be expansive and successful worldwide" (¶14); he "told potential investors . . . that he was successful and had made millions to billions of dollars through his business" even though he knew that his company "did not conduct any legitimate and successful import-export business and DUONG had not made millions of dollars through such business" (¶16); Duong is alleged to have told investors that he "had a large contract or contracts for garments, rice or sugar, by which he would make a large profit, usually in the millions, and that he would allow them to participate and profit in the business deal with him if they invested a sum of money with him. . .[and] that they would see a significant return on their investments within three months" (¶17); and, even when "investors inquired about their investment or requested a return of their money, . . . [Duong] continued to make representations, which he knew to be false, about his other businesses, profits and successes in order to lull investors and keep investors believing in him" (¶29).

States' [sic] banks when it was released.

¶18.  Duong told other investors that one or another of the corporations which he had formed and which he controlled had a large commodities contract worth millions of dollars in profits which he was willing to share with them if they invested money, usually in the range of $20,000 to $30,000 per investor, with him.  ¶17.

The government has alleged that Duong "incorporated numerous corporations for the stated purposes of engaging in various international business, including (1) international trading and the import and export of goods, such as garments, commodities and jewelry; (2) financial services and investments; (3) the development, manufacture and marketing of fashion and garment products; and (4) Web hosting, advertising, and design."  ¶13.  The main corporation used by Duong in his scheme to defraud was Asian Golden Dragon Corporation ("AGDC"), which Duong had incorporated in 1995 and of which he was President.  Indictment ¶¶6 and 13.  He represented it to be the "parent or mother corporation."  ¶13.  The other corporations used by Duong as part of his fraudulent scheme included Global Garment Exchange Internet Corporation ("Global"), which Duong incorporated in June, 2000, ostensibly (according to the Articles of Incorporation) "to develop, manufacture and market products in the garment industry and related industries, such as fashion, jewelry, cosmetics, . . . and to engage in the business of Web hosting, Web advertising, and Web designing" (¶¶7 (internal quotes omitted) and 13); International Diamond and Gem Corporation ("International Diamond"),of which Duong is President and which the Articles of Organization state was formed "to engage in the business of jewelry design and repair, jewelry cutting and setting, jewelry service, gold refinery, jewelry importing and exporting, and wholesale and retail [sales] of diamond, gold, silver, gemstones, pearls and jade" (¶¶8 and 13); and Fifth Continental Capital Group

Financial Corporation ("Fifth Continental"), which Duong formed in January, 2001, of which he was the Chairman, Treasurer, Clerk and a Director, and which was formed "[t]o engage in the business of financial industry [sic], financial service, trading commodity and stock . . .[and] Import [sic], export and wholesale commodity" (¶¶9 and 13). The indictment alleges that, with the exception of International Diamond, under whose name Duong operated a small retail jewelry store in Quincy, none of these corporations had any legitimate business income or assets. ¶¶ 8 and 13.

The indictment alleges that, as part of the scheme to defraud and "to make his business appear legitimate to potential investors and induce them to invest, DUONG had logos, business cards, photo identification cards, letterhead, signature stamps and seals [as well as promotional literature and websites] designed and produced for many, if not all, of the companies" he formed and controlled. ¶14. Similarly, Duong cloaked his fraudulent activities in the trappings of real businesses by telling many of his investors that they had to form corporations of their own (many off-shore) to participate in Duong's business ventures and to enter into contracts with the sellers and/or buyers of commodities such as rice and sugar. ¶15. Duong provided these investors with "formal corporate documents, seals and stamps for their corporations" and directed them to "open bank accounts in the names of their corporations in order to receive the profit from their business dealings." Id.

According to the indictment, Duong also "showed investors bank documents, such as an application for an irrevocable letter of credit, stating that such documents verified that DUONG had access to millions of dollars. These documents often would be written in languages, such as Vietnamese, Chinese and English, that the particular investor could not read." ¶19. Similarly, Duong "showed potential investors documents which appeared on their face or were represented by

DUONG to be contracts, to which AGDC was a party, for large quantities of garments, rice, sugar or other good with total contract sale prices in the hundreds of millions of dollars." ¶20. Some of these documents "identified the newly incorporated company of the investor as a party to the contract." Id. Duong "had the investors sign . . . documents and stamp them with their corporate seal, again using the formality and the documents to make the business appear legitimate," even though some of the documents were in languages which a particular investor could not read. Id.

As part of the scheme alleged in the indictment, "DUONG traveled to China, Vietnam, and other countries and told investors that these trips were related to the businesses and contracts in which they had invested." ¶21. At Duong's invitation, a number of investors accompanied Duong on one or more such overseas trips, where Duong purported to "negotiate and enter into business transactions with companies in Vietnam, China and other countries, to make his business appear legitimate" even though, "[i]n the end, no business deals or contracts were ever completed or successful." ¶21.

The indictment further alleged that Duong "gave numerous excuses to investors when they inquired about their investment or requested a return of their money" and that "[t]he lulling of investors was an important part of the scheme [to defraud] because it allowed DUONG to continue to operate the scheme and obtain money from additional investors." ¶28. At times, Duong "blamed the failure of contracts on others," including associates or investors, "but still promised the investors that they would ultimately be successful." ¶29. He "mailed formal notices and correspondence to investors, reporting on the companies and scheduling meetings, to further convince investors that the business and investment was legitimate and to lull them into a sense of security" (¶30); lulled investors by purporting to transfer their investments and allow them to participate in new ventures

when their investments failed to realize a profit (¶31); and "made up rules and regulations that the investors would have to follow to get a return of their money, thereby making it appear that they could not get their money back because of legitimate and legal rules and regulations governing corporations" (¶32).

Duong never returned to any of his investors either their principal investment or any of the profits he had promised. ¶32. According to the indictment, he "defrauded approximately 10 or more investors of over $200,000." ¶27. It charges him with 14 acts of mail fraud between November 1, 1999 and August 28, 2002, all involving items which Duong mailed or caused to be mailed to investors (Counts 3-7, 9-12); which investors mailed at his direction (Counts 1 and 14); which investors received in response to mailings which Duong had made of which the investors themselves had made at Duong's direction (Counts 2 and 13); or which investors mailed to Duong inquiring about their investments (Count 8).

The indictment further alleges that, from 1995 to the time of his arrest, Duong "had at least seven [enumerated] different bank accounts in the name of AGDC;" "used three [enumerated] personal accounts in his own name at three different banks;" used an account in the name of International Diamond "to conduct the limited activities of his small jewelry store as well as for conducting transactions with the money he obtained from investors;" and used a bank account in the name of Global. ¶23. The indictment alleges, as part of his scheme to defraud, "DUONG deposited money received from investors into these [enumerated] accounts and then withdrew the money by means of currency transactions under $10,000 to avoid the reporting of these currency transactions by the bank and to further conceal his fraudulent scheme and the proceeds derived from that

scheme." ¶25 (see also ¶26). In Counts 24-28[4], Duong is charged with having structured or assisted

in structuring 5 series of transactions with domestic financial institutions between September 20,

2001 and May 15, 2003 for the purpose of evading currency transaction reporting requirements.

¶¶37-38.

## II.    Elements of the Offenses

A.    Mail Fraud -- 18 U.S.C. § 1341

18 U.S.C. § 1343 provides, in pertinent part, that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or by such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be punished . . . .

The essential elements of the offense are:

(1)    Devising or attempting to devise a scheme or artifice to defraud or to obtain money or property by false and fraudulent prentenses, representations, or promises;

(2)    The use of false statements, assertions, half truths or knowing concealments, concerning material facts or matters;

(3)    Knowing and willful participation in the scheme with knowledge of its fraudulent nature and with the specific intent to defraud; and

(3)    Use of the mails or private commercial carrier in furtherance of the scheme.

Neder v. United States, 527 U.S. 1, 23 (1999); United States v. Blastos, 258 F.3d 25, 27-29 (1st Cir.

---

[4] Counts 15-23 contained the money-laundering charges which the government dismissed.

2001). The scope of fraud under these statutes is broader than common law fraud. See McEvoy Travel Bureau v. Heritage Travel, 904 F.2d 786, 791 (1st Cir. 1990). While a misrepresentation of fact is not necessary to establish a scheme to defraud, "a demonstrated intent to deceive is required," United States v. Sawyer, 85 F.3d 713, 732 (1st Cir. 1996), by means of "false or fraudulent pretenses, representations, promises, or other deceptive conduct." McEvoy Travel Bureau, 904 F.2d at 791. At the same time, no amount of honest belief on the part of a defendant that a particular investment will ultimately make money will excuse false representations or promises made to obtain money, United States v. Mueffelman, 470 F.3d 33, 37 (1st Cir. 2006), and, if the defendant intended to devise a scheme to defraud, it makes no difference whether the persons targeted by the defendant were gullible or skeptical, dull or bright – the mail fraud statute protects the naive as well as the worldly-wise. United States v. O'Brien, 617 F.2d 299, 311 (1st Cir. 1980). Moreover, each separate use of the mails in furtherance of a scheme to defraud is punishable independently. United States v. McClelland, 868 F.2d 704, 706 (5th Cir. 1989).

    The First Circuit has held that to fall within the scope of the mail fraud statute, a mailing need only be sufficiently connected to the scheme to defraud, and be reasonably foreseeable as a result of the defendant's actions. Yefsky, 994 F.2d at 892; United States v. McNeill, 728 F.2d 5, 14 (1st Cir. 1984); United States v. Martin, 694 F.2d 885, 889-90 (1st Cir. 1982). All that is needed in this regard is that the mailing bear the requisite relationship to the fraudulent scheme. United States v. Morrow, 39 F.3d 1228, 1236-37 (1st Cir. 1994) (insurance claims materials mailed by Aetna Ins. Co. to one of co-conspirators). In other words, for mailings to be considered "in furtherance of the scheme, the scheme's completion or the prevention of its detection must have depended in some way on the mailings." United States v. Pacheco-Ortiz, 887 F.2d 301, 305 (1st Cir.

1989); see Schmuck v. United States, 489 U.S. 705, 710-711 (1989) ("[t]o be part of the execution of the fraud, however, the use of the mails need not be an essential element of the scheme. . . . It is sufficient for the mailing to be 'incident to an essential part of the scheme,' or 'a step in [the] plot,'" quoting Badders v. United States, 240 U.S. 391 (1916)); and United States v. Slevin, 106 F.3d 1086, 1089-90 (2nd Cir. 1996)("Where the frauds are not isolated or unrelated swindles, postfraud mailing of invoices, checks, or receipts may further the scheme by, for example, lulling the victims into believing they received the services fraudulently promised, [citations omitted], or by helping to keep the scheme in operation by preserving a needed business relationship between a fraud victim and the defendant," quoting Schmuck, 489 U.S. at 711-12).

Moreover, the "defendant need not personally use the mails or wires as long as such use was a reasonably foreseeable part of the scheme in which he participated." Sawyer, 85 F.3d at 723, n.6 (quoting United States v. Boots, 80 F.3d 580, 585 n.8 (1st Cir. 1996)); see also United States v. Pimental, 380 F.3d 575, 584 (1st Cir. 2004). For example, a mail fraud violation may be found where a defendant causes an investor to mail him a check. See United States v. Roylance, 690 F.2d 164 (10th Cir. 1982).

B.    Structuring

31 U.S.C. § 5324(a)(3) provides:

No person shall for the purpose of evading the reporting requirements of section 5313(a) . . . or any regulation prescribed . . . under such section . . . (3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

Structuring is defined by regulation as a person who, "acting alone, or in conjunction with, or on behalf of, other persons, conducts or attempts to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, in any manner, for the

purpose of evading the reporting requirements under Section 103.22 of this Part."  It "includes, but is not limited to, the breaking down of a single sum of currency exceeding $10,000, into smaller sums, including sums at or below $10,000, or the conduct of a transaction, or series of currency transactions at or below $10,000."  31 C.F.R. § 103.11(p); <u>see</u> <u>also</u> <u>United States v. Hurley</u>, 63 F.3d 1, 13 (1st Cir. 1995).

>The elements of the crime of structuring are:

>First, that the defendant knew that a financial institution was legally obligated to report currency transactions in excess of $10,000;

>Second, that the defendant engaged in the structuring of a currency transaction; and

>Third, that the defendant acted with the intent to evade the reporting requirement.

3 <u>Mod.</u> <u>Fed.</u> <u>Jury</u> <u>Instructions</u>, ¶ 50B.05, Instruction No. 50B-24, p. 50B - 39.  Section 5324(d)(2) provides for a higher maximum penalty (doubling it from 5 to 10 years) if a defendant committed a structuring offense either "while violating another law of the United States **or** as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period . . . ."  31 U.S.C. § 5324(d)(2) (emphasis added).  The structuring counts charged against Duong allege just over $100,000 in structuring in a twelve-month period and the Indictment explicitly charges Duong with committing the charged structuring offenses while committing another federal offense (<u>i.e.</u>, mail fraud).  Therefore, pursuant to <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), in addition to deciding whether or not Duong is guilty of each of the structuring offenses, the jury should be asked to render special verdicts on whether the government has proven beyond a reasonable doubt the presence of either of the factors giving rise to an enhanced maximum penalty.

>Direct proof of a defendant's knowledge or intent is not always available, and such proof is

not required.  The ultimate fact of whether someone knew something at a particular time or had a particular intent, though subjective, may be established by circumstantial evidence, based upon a person's outward manifestations, his words, his conduct, his acts, and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn from them.  3 Mod. Fed. Jury Instructions, ¶ 50B.05, Instruction No. 50B-21 and 23, p. 50B - 31 and 37.

C.    Aiding and Abetting -- 18 U.S.C. § 2

Under the aiding and abetting statute, a person who commits an offense against the United States, or who aids, abets, counsels, commands, induces, or procures its commission, is punishable as a principal.  Therefore, if a person acts, or fails to act, with the intent to help the commission of a crime by another, he is punishable as a principal.  United States v. Mitchell, 23 F.3d 1, 2 (1st Cir. 1994).

One who aids and abets the commission of an act "is as responsible for that act as if he committed it directly."  Nye & Nissen v. United States, 336 U.S. 613, 618 (1949);  United States v. Mehrmanesh, 682 F.2d 1303, 1308 (9th Cir. 1982).  This is so whether or not the defendant had an interest or stake in the transaction.  See e.g. United States v. Bryant, 461 F.2d 912 (6th Cir. 1972).  To be an aider and abettor, one "need not perform the substantive offense, be present when it is performed, or be aware of the details of its execution."  United States v. Loder, 23 F.3d 586, 591 (1st Cir. 1994).  The acts of the principal become the acts of the aider and abettor as a matter of law.  Mitchell, 23 F.3d at 2.

### III.    Summary of the Evidence to Be Presented by the Government

The government's witnesses fall into three categories.  The first category includes over a dozen victims or intended  victims of Duong's fraudulent scheme who will tell the jury about their dealings with Duong and his associates between 1996 and 2003 and about the mailings that are the subject of the mail fraud counts.  A second category of miscellaneous fact witnesses include the following:

> Robert Papanos, Vice President of the U.S. Rice Producers Association, who is knowledgeable in the international rice trade  and who will testify that the rice contracts which Duong presented to his investors and which Duong purported to enter into with foreign entities do not make sense and are inconsistent with the realities of the international rice trade;

> Peter Karl, Security Director for State Street Bank, who met with Duong when Duong was interviewing banks in 2003 to determine which one Duong would use to conduct millions of dollars in transactions and to whom Duong provided various documents, including what purported to be UBS bank guarantees evidencing billions of dollars held in UBS accounts by persons or entities with whom Duong claimed to be doing business;

> FBI Special Agent Kevin Swindon, who spoke and met with Duong in 2003 while operating in an undercover capacity, posing as another representative of State Street Bank and, to whom Duong also produced documents;

> Michael Troccia of UBS, a worldwide bank, who has examined the UBS documents produced by Duong and who will testify that the documents are obvious forgeries; and

> unless stipulations are reached concerning how such witnesses would testify, Keepers of the Records from Gap, Inc. and Home Depot, Inc. to the effect that neither company has done any business with Duong or any of his corporations (contradicting consensually recorded statements Duong made in 2001 to one or more of his victims).

The final category of witnesses to be offered by the government as part of its case-in-chief includes an Immigration & Customs Enforcement agent to authenticate a copy of Duong's immigration file, unless the defendant stipulates to its authenticity, in which event it will be offered into evidence by IRS - Criminal Investigations Special Agent Ann Cotellesso, who will testify about a search of

Duong's last place of business, about information contained in Duong's personal and corporate tax returns and her analysis of his personal and corporate bank accounts.  Most of the victims or intended victims are persons of Vietnamese or Chinese descent with varying degrees of fluency in English who will testify through, or at least with the aid of, a court interpreter.

The government's trial witnesses will testify that Duong solicited investments in what he described as his international import-export business.  Duong told potential investors that he was the President of Asia Golden Dragon Corporation ("AGDC") and the owner of numerous other companies that were involved in the trading of products and commodities as diverse as garments, rice, sugar, fertilizer, recycled products and food and medicine purportedly destined for impoverished countries.  At various times, the other corporations used by Duong included: Global Garment Exchange Internet Corporation ("Global Garment"), International Diamond & Gem Corporation ("Diamond and Gem") and Fifth Continental Capital Group Financial Corporation ("Fifth Continental"), as well as others, including International Help Charities Corporation ("Help Charities"), and International Recycle Investment Group Import and Export Corporation ("Recycle Investment").

Duong was assisted by various individuals in his efforts to secure investors.  Various government witnesses will testify that Duong introduced John Chang ("Chang") to them as his assistant; that Chang was of Chinese extraction and spoke Chinese fluently; that they observed Chang working for Duong at AGDC's place of business; and that they observed Chang  preparing contracts and other corporate documents at Duong's direction; and that Chang accompanied them and Duong on overseas trips supposedly involving the transactions in which they had invested. Other government witnesses will testify that, from sometime in early 1998 until late 2000, Duong

also was assisted by Khang Thi Nguyen, a/k/a Katherine (hereinafter referred to as "Katherine" or "Katherine Nguyen" in order to distinguish her from the numerous other individuals involved in this case who bear the same family name, Nguyen).  Katherine also was a Vietnamese immigrant who operated a small jewelry store at 333 Washington Street in the Downtown Crossing area of Boston. For approximately two years, from late 1998 until late 2000, Duong operated AGDC and his associated enterprises out of Katherine's jewelry store.  Some government witnesses who invested money with Duong also will testify that, at Duong's urging, they solicited, or attempted to solicit, additional investors until they lost faith in Duong.

Duong, assisted by Chang, Katherine, or others, induced individuals to give him their money, usually in allotments of $20,000 or $30,000 (except in 2003, when Duong persuaded members of the Vu family of South Portland, Maine to make two $50,000 investments in his companies and in late 2003, just days or weeks before Duong's arrest on the instant charges, when he persuaded the Vus to lend him $400,000), for investment in his global import-export business by promising them that they would make large sums of money on their investments in a short period of time, usually just a few months.  Part of the "sales pitch" made by Duong or his associates was that Duong was successful in this line of work; that he made a lot of money; and that he was willing to share that wealth with willing investors.  Duong also represented that he had connections with important government officials and dignitaries in China, Vietnam and other Southeast Asian countries that were helpful in enabling him to conduct business in those countries and/or with the governments of those countries.

Duong and his associates did not describe the same business opportunity to each investor or set of investors (some of whom were members of the same family or were acquainted with one

another before meeting Duong). Duong told some investors that he had been entrusted with or had access to billions of dollars in gold which some Chinese generals had placed in the United States for safekeeping and that their investment capital was needed somehow to release that gold or, alternatively, was needed to pay for a bond to make the gold available as collateral for Duong's business enterprises. More often, investors were told that they were investing directly in one or more of Duong's companies; that their investment allowed them to open a franchise which would operate under the umbrella of and share in the profits of Duong's corporations; that they were investing in contracts which Duong had negotiated with foreign entities; or that they were investing in a bond necessary for Duong to perform under one or more such contracts. Duong showed potential investors what he represented to be his company's contracts for the sale of commodities, such as rice or sugar; for the manufacture and sale of garments; for the mining and production of diamonds; and/or contracts calling for the use of recycled materials to build hospitals and other facilities in Southeast Asia. Duong also had his investors sign contracts, sometimes written in languages the investors could not read, and other documents which appeared to contain provisions and terms of art which the investors did not understand but which Duong represented were customary in his line of work. More often than not, Duong also required that his investors create corporate shells of their own and open corporate bank accounts in order to conduct business with him. Duong instructed investors how to fill out the forms necessary for incorporating such entities and, in the early years, instructed them to send their forms, along with a check covering applicable fees, to a company in Florida which would handle the incorporation process for them in offshore locales, such as the Isle of Man or the Turks and Caicos, whereas, in later years, Duong had investors simply file incorporation papers at the Massachusetts Secretary of State's Office.

When investors gave Duong their money, he would deposit it into one of the several bank accounts that he controlled and that were held either in his own name or in the name of one of his companies, usually AGDC or International Diamond and Gem. Duong urged some of his investors to give him their money in the form of cash rather than checks. Duong instructed one investor to give Duong his $30,000 investment in the form of four checks: three for $9,000 each and one for $3,000. Still later, Duong told an undercover FBI agent posing as a bank representative (S/A Kevin Swindon) that he did not conduct business transactions in cash. Once investor funds were deposited, Duong typically withdrew the money, usually in the form of multiple checks made payable to himself in amounts under $10,000 each, which Duong then cashed over the course of several days.

Duong also invited investors to travel overseas with him, to China, Vietnam and/or Indonesia, in order to meet and conduct business with government officials and/or the entities identified in the contracts in which the investors thought they were investing. However, after arriving overseas, the investors found that their contacts with their hosts were limited to banquets or other ceremonial functions at which toasts were exchanged and speeches were made without any translation. Duong would tell his investors that they could not participate in any of the substantive meetings he was having because their hosts did not want too many people in attendance or only wanted to deal with the most senior people. Consequently, while investors occasionally saw documents executed or signed documents themselves while overseas, they never saw any other evidence of business actually transacted during the course of these trips.

None of Duong's investors who will testify at trial ever earned any profit whatsoever on their

investment or even received back from Duong any of their initial investment.[5] If and when investors complained to Duong or requested that he return their money, Duong would engage in a series of delaying of lulling tactics, including telling them that performance of the transaction in which they had invested had not yet been completed; blaming other persons or entities for why a particular transaction had failed; substituting their "shares" in one Duong corporation for "shares" in another Duong corporation; telling how Duong was realizing enormous profits in transactions to which these investors were not privy; assuring the investors that they just needed to show more patience; and/or advising investors that they could get their money back if they first formally offered in writing to have the parent Duong corporation buy back their "shares" and, if that offer were declined after 90 days, to find someone else to buy their "shares." Yet, a review of the various bank accounts controlled by Duong will show that, with very limited exceptions attributable mostly to a jewelry business which Duong himself operated in the later years, almost all the funds in those accounts were attributable to individual investors. Duong's bank records contain no evidence whatsoever of any completed commercial transactions on the scale of those projected in the contracts he showed to investors or had them sign; any sums of money or transactions consistent with his self-portrayal as a successful commodities trader; or any sums of money or transactions commensurate with the success he described himself as experiencing in other deals when investors complained to him about his non-performance on their deals. Moreover, in the personal tax returns he filed during the period between 1994 and 2003, Duong reported yearly adjusted gross income ranging from a high of just under $8,000 in 1994 (when other records reflect that he was working as a machinist) to a low in

---

[5] While the government has not been able to identify or locate each and every individual who ever invested money with Duong, the government is not aware of <u>any</u> investor who made any profit or received any restitution.

1999 of negative (i.e., a loss of) $5,123.  Similarly, the tax returns Duong filed during the period

between 1996 and 2001 on behalf of AGDC reported total assets ranging from $17,019 in 1995 to

a high of $144,046 in 1999, but no "[o]rdinary income . . . from trade or business activities."  As for

the other corporate entities through which Duong operated, either he filed no federal tax returns on

their behalf or he reported negligible income (such as a total net income of just over $10,000 for

International Diamond & Gem for tax year 2001).  In fact, in late September of 2003, in a

consensually recorded meeting of a meeting between Duong, a representative of State Street Bank

(Peter Karl) and an undercover FBI agent posing as another bank representative (S/A Kevin

Swindon), Duong explained that AGDC had not done any business or made any profit during the

preceding five years.

      In light of the large number of Asian names involved in this case, the government has

**attached hereto as Exhibit A for the Court's convenience** a list of the names likely to surface in

this case, arranged alphabetically by the individual's final name (whether or not that name actually

is that individual's family name) with a very abbreviated form of description intended to identify that

individual's role in the case and/or to distinguish that individual from (or confirm that individual's

relationship to) other persons in the case bearing the same final name.  (Essentially, this is the

equivalent of the "dramatis personae" which this Court requested that the government provide to it

in connection with the evidentiary sentencing hearings in an unrelated case involving numerous

foreign names.)

## IV.    Evidentiary and Other Trial Issues

      Defense counsel have recently confirmed to the government that the defendant will not be

raising any psychiatric or mental health defense.  Other issues currently anticipated by the

government include the following:

Admissibility of statements made by Duong's agents:

Naturally, statements made by Duong to his victims or to other witnesses are admissible against Duong as admissions. F.R.Evid. 801(d)(2). However, the government anticipates that several of Duong's victims will testify about profits promised or predicted by Duong's associates, Chang and/or Katherine, which were consistent with the representations made to these victims by Duong himself. These statements are admissible against Duong himself either pursuant to F.R.Evid. 801(d)(2)(C) because they constitute "statement[s] by a person authorized by the [defendant] to make a statement concerning the subject," or pursuant to F.R.Evid. 801(d)(2)(D) as "statement[s] by the [defendant's] agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship . . . ."

A number of Duong's victims will testify that they frequently saw Chang working at Duong's place of business; that Duong introduced and/or described Chang as his associate or assistant in conversations with victims or potential investors (including in consensual recordings when Duong referred to Chang as representing Duong in the sale of one or more "garment center" in Germany or to German business interests); that, when necessary, Chang served as a Chinese-language interpreter for Duong in the course of Duong's business activities; that Chang typed or processed contracts and other documents on Duong's instructions; that Chang accompanied Duong and others on business trips overseas; and that Chang otherwise operated at Duong's direction. A number of Duong's victims will testify that, at least between sometime in 1998 and approximately October of 2000, Duong's place of business was located in the jewelry store operated by Katherine; that Katherine was present during many meetings victims had with Duong concerning their investments

and/or the documents relating to their investments; that Katherine traveled with Duong and others on business trips overseas; and that it was Katherine who first encouraged them to invest money with Duong. The government also will offer consensual recordings in which Duong tells investors that Katherine (with whom Duong had a serious falling out on or about October 23, 2000) had been appointed by him as an officer of AGDC; that she (and her husband) had recruited investors for his business; and that he had paid her (and her husband) a commission for each actual investor.[6]

Accordingly, the statements made by Chang (throughout his association with Duong) and/or Katherine (during the 1998-2000 time frame) to investors or potential investors are admissible against Duong as made by Duong's agents. See United States v. Agne, 214 F.3d 47, 55 (1st Cir. 2000)("An agency relationship between an employee declarant and a defendant employer may be established by a variety of evidence, such as evidence that the declarant is directly responsible to the defendant . . . ; that the declarant reports directly to the defendant who owns an overwhelming majority of stock in the company . . .; that the declarant was hired by the defendant and worked on matters in which the defendant was actively involved . . . ; or that the defendant 'directed [the declarant's] work on a continuing basis,' . . .")(citations omitted); Nekolny v. Painter, 653 F.2d 1164, 1171-1172 (7th Cir. 1981), cert. den. 455 U.S. 1021 (1982) (statements to plaintiffs ruled admissible against defendant when made by person whom defendant had identified as her "liaison" and "adviser" to the agency by which the plaintiffs were employed).

---

[6] The government is not aware of any investors who were solicited by Katherine's husband, Nhut Cao, and does not believe that Duong compensated Katherine in any way for her success in getting people to invest in his business activities. Nevertheless, these representations by Duong are offered here (and would be offered at trial) not so much for the truth of the matter asserted therein but as evidence of Duong's intent or state of mind with respect to the agency relationship between him and Katherine during the 1998-2000 time frame.

Admission of and jury's use of English translations of consensually recorded
conversations conducted in Vietnamese:

As of this writing, the defendant has indicated through counsel that he will stipulate to the
accuracy of the transcriptions and English translations of certain consensually recorded
conversations between Duong and various victims and of certain consensually recorded
conversations between Duong and Peter Karl of State Street Bank and/or S/A Kevin Swindon, then
posing as another State Street Bank representative.[7]   The recorded conversations between Duong
and his victims were conducted entirely in Vietnamese, except for occasional words spoken here and
there in English.  Peter Karl and/or S/A Swindon spoke in English, but Duong answered almost
exclusively in Vietnamese, aided by his attorney and associate, Kim Vo, who is bilingual.

The government proposes to introduce as exhibits and as substantive evidence the tranlsated
transcripts of the consensually recorded conversations between Duong and his victims since the
recordings themselves will be of no use whatsoever to the jury since, for all intents and purposes,
the recordings contain no English.  In the case of the consensually recorded conversations between
Peter Karl and/or S/A Swindon, on the one hand, and Duong, on the other hand, the government
proposes to introduce as exhibits and as substantive both the recordings themselves[8] (since the
conversations were conducted at least partially in English) and the translated transcripts of those
recordings.   As the First Circuit held in United States v. Font-Ramirez, 944 F.2d 42, 49 (1st Cir.

---

[7]  In so stipulating, the defendant has indicated through counsel that he wishes to see if he
can determine whether or not there were any portions of the conversations in question which either
were not transcribed and translated or were not recorded at all.

[8]  The government proposes to offer into evidence discs containing digitized copies of the
recordings originally made on cassette tapes since the digitized format will facilitate anyone's effort
to move from one part of the recording to another.

1991), with respect to recordings made of conversations conducted in a foreign language:

> It is permissible to allow an English language jury to evaluate evidence of a tape recorded conversation in Spanish solely through use of a properly authenticated English language transcript. In United States v. Rengifo, 789 F.2d 975, 983 (1st Cir. 1986), this Court held that a district court did not abuse its discretion by permitting the government to present taped Spanish conversations through the use of readers who read English translation transcripts into evidence. This procedure was acceptable in view of the fact that the Rengifo jury was comprised entirely of jurors who understood no Spanish. See also United States v. Cruz, 765 F.2d 1020, 1024 (11th Cir. 1985) (permitting an English language jury to consider translated transcripts as substantive evidence).

Accordingly, the government submits that this Court should exercise its discretion not only to allow the government to submit to the jury in this matter translated transcripts as indicated above, but should also allow the jury to refer to said translations during the course of its jury deliberations, since the tape recordings of the Vietnamese conversations will be of little or no use to the jurors (barring the unlikely eventuality of a bilingual juror who speaks both Vietnamese and English, which would raise a different and potentially more nettlesome problem insofar as it likely would have the effect of allowing one juror to have undue influence during jury deliberations).

Testimony of lay witnesses with specialized knowledge:

In or about the summer of 2005, the government provided notice to the defendant of three fact witnesses whose testimony the government anticipated offering at trial and of the government's intent to qualify those witnesses as experts pursuant to F.R.Evid. 702, if necessary. The government's notice included a summary of the proposed witnesses' background and qualifications; copies of reports summarizing any interviews with the witnesses; and a written summary of the witnesses' anticipated testimony. The disclosures in question included one for Robert Papanos.[9] Mr.

---

[9] In preparing for the January 29, 2007 trial in this matter, the government has learned that Jon Merritt, an Englishman formerly employed by the International Chamber of Commerce, is no

Papanos is Vice President of the U.S. Rice Producers Association, was a rice trader for over twenty years and previously worked for Cargill Corporation, one of the largest U.S. rice traders. Mr. Papanos will testify that he has reviewed some of Duong's purported rice contracts and that some of the basic terms contained therein -- who is selling the rice, what kind of rice is being sold, the quantity of rice involved in the contract, the duration of the contract and who the end-buyer is -- simply do not make sense and are inconsistent with the realities of the international rice trade.[10] The government is not aware of, and to date the defendant has not expressed, any objection to Mr. Papanos' qualifications or to admissibility of his anticipated testimony pursuant to Rule 702.

Nevertheless, the government submits that Mr. Papanos' testimony is admissible pursuant to F.R.Evid. 701, regardless of the Court's analysis under Rule 702. This also is true of the testimony of Michael Troccia, a representative of UBS, a Swiss bank with branches all over the world. Mr. Troccia will testify that he has examined copies of the UBS guarantees which Duong provided to Peter Karl and/or S/A Swindon as evidence that the foreign entities with which he was doing business had very substantial assets. Mr. Troccia will further testify that the documents in question are obviously counterfeit and that anyone wishing to verify the authenticity of those documents could readily have done so by submitting them for examination by a UBS representative.

---

longer so employed and will not be made available to testify by his current employer. Therefore, the government is currently trying to see if it can, on a timely basis, identify a qualified individual who could testify on the same matters covered in the government's 2005 notice. The government has decided not to call as a witness in its case-in-chief Christopher Cody, the third individual identified in the government's 2005 notice.

[10] Consistent with a fact witness, Mr. Papanos is not being paid by the government for his testimony, other than the fees or expenses paid or reimbursed to any other fact witness. Since Mr. Papanos will be traveling to Boston from Texas to testify and in light of his other time commitments, the government hopes, with the Court's permission, to call Mr. Papanos as the first witness on a Monday morning, even if that means interrupting another witness.

Rule 701 allows a lay witness to give opinion testimony if the testimony is "(a) rationally based on the perception of the witness; (b) helpful to a clear understanding of the witness' testimony or the determination of a fact at issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of rule 702". Fed.Rule Evid. 701. The rule, as described in the advisory committee notes, allows testimony derived from particularized knowledge that the witness knows by virtue of personal experience in a position. Advisory Committee's Notes on Fed.R.Evid. 701 (stating that, for example, a business owner may give lay testimony on the value or projected profits of his business, "because of the particularized knowledge that the witness has by virtue of his or her position"). The defining line is that

> lay testimony "results from a process of reasoning familiar in everyday life," while expert testimony "results from a process of reasoning which can be mastered only by specialists in the field."

Id., quoting State v. Brown, 836 S.W.2d 530, 549 (Tenn. 1992). Thus, as the note describes it, a drug user may identify a particular drug, and a business officer may testify as to a business' value or projected profits, under Rule 701. Here, the testimony to be offered by Messrs. Papanos and Troccia amounts to observations derived from particularized knowledge which they possess by virtue of their personal experience as a rice trader and a UBS representative, respectively. Mr. Papanos is familiar with the terms governing international rice transactions over a decades-long time span and Mr. Troccia is familiar with the banking practices of and documents generated by his employer, UBS. Each of them will supply conclusions deduced in an everyday manner from those personal experiences. Their testimony, therefore, falls within the ambit of and is admissible pursuant to Rule 701. See United States v. Ayala-Pizarro, 407 F.3d 25, 28 (1st Cir. 2005) (Court

of Appeals ruled that the district court had acted correctly in admitting the officer's testimony under

Rule 701 "because it was based on 'particularized knowledge that the witness [had] by virtue of his

. . . position' as a police officer assigned to patrol the neighborhood") (quoting from Fed.R.Evid.

701, advisory committee's note)(footnote omitted); and  United States v. Paiva, 892 F.2d 148, 157

(1st Cir. 1989)(describing the "liberalization" of Rule 701, First Circuit explained that "[n]o longer

is lay opinion testimony limited to areas within the common knowledge of ordinary persons. Rather,

the individual experience and knowledge of a lay witness may establish his or her competence,

without qualification as an expert, to express an opinion on a particular subject outside the realm of

common knowledge").

        Summary charts and witnesses:

        The government intends to offer at trial through IRS-CI Special Agent Ann Cotellesso

summary charts concerning the voluminous bank records she reviewed and analyzed concerning

personal and business accounts Duong and/or his associates maintained at a variety of accounts

during the late 1990s and early 2000s.[11]  Fed. R. Evid. 1006[12] permits the contents of voluminous

writings which cannot be conveniently examined in court to be presented in the form of a chart or

---

        [11]  The defendant has agreed to stipulate to the authenticity of the bank records in question
and will not require that the government offer the testimony of various bank representatives or
keepers of the record in order to authenticate those business records.

        [12]        Fed. R. Evid. 1006 provides that:

                The contents of voluminous writings, recordings, or photographs
                which cannot conveniently be examined in court may be presented in
                the form of a chart, summary, or calculation.  The originals, or
                duplicates, shall be made available for examination or copying, or
                both, by other parties at reasonable time and place.  The court may
                order that they be produced in court.

summary.  See generally United States v. Milkiewicz, 470 F.3d 390, 395-398 (1st Cir. 2006) (clarifying  the "landscape" as it relates to summary charts).  It is not required that it be literally impossible to examine the underlying records before a summary or chart may be used.  All that is required is that the underlying records be voluminous and inconvenient for the jury to examine. United States v. Scales, 594 F.2d 558, 562 (6th Cir.), cert. denied, 441 U.S. 946 (1979).

In United States v. Sawyer, 85 F.3d 713, 740 (1st Cir. 1996), the Court affirmed the admission of a computer printout summarizing 612 expenditures "based on evidence that was already independently admitted and that was relevant to Sawyer's questionable expenditures during the indictment period."  The Court rejected arguments that the summaries were incomplete and misleading, stating that the defendant "had the opportunity, on cross-examination, to place the summaries in context with his total financial activity."  Id, citing to United States v. Nivica, 887 F.2d 1110, 1125 (1st Cir. 1989) for proposition that "argument that summaries failed to, inter alia, reflect 'total financial activity' 'affect[s] weight rather than the admissibility.'".

"So long as the government, exercising due diligence, collects whatever records are reasonably available and succeeds in introducing them, it may be permitted (subject, of course, to relevancy and perscrutation under Fed. R. Evid. 403) to summarize the data it has managed to obtain."  United States v. Nivica, 887 F.2d at 1126.  "If defendants possess[] exculpatory records not in the government's files, they [can] offer[] them at trial or prepare[] their own summary."  Id. "By the same token, if there [a]re gaps in the chartes, the defense . . . ha[s] every opportunity to exploit them."  Id.  "In the last analysis, completeness of the underlying records [i]s for the jury." Id.   In United States v. Sorrentino, 726 F.2d 876, 884 (1st Cir. 1984), a net worth schedule based exclusively on primary evidence was admitted because it helped the jury to understand and evaluate

the primary evidence.  The Court in <u>Sorrentino</u> stated that "it is well established that summary exhibits such as net worth schedules are admissible for the convenience of the jury."  <u>Id</u> at 884. Moreover, the First Circuit recently made it clear that summary charts are admissible as evidence themselves under Rule 1006 regardless of whether or not the voluminous underlying documents are also admitted into evidence.  <u>Milkiewicz</u>, 470 F.3d at 396-397 (acknowledging that "in most cases a Rule 1006 chart will be the *only* evidence the fact finder will examine concerning a voluminous set of documents")(citation omitted).[13]

Many jurisdictions have allowed a non-expert to summarize evidence already presented in order to help the jury to evaluate evidence that is complex.  <u>United States v. Lemire</u>, 720 F.2d 1327, 1347 (D.C. Cir. 1983).  In <u>Lemire</u>, it was argued that a non-expert summary witness is improper under <u>Fed</u>. <u>R</u>. <u>Evid</u>. 602, which requires that non-experts testify only as to matters of which they have personal knowledge in order to insure reliability.  The Court said the non-expert was proper since he only summarized evidence already admitted.  With regard to the summaries themselves, the fact that he produced the charts, using his knowledge as an accountant, satisfied the personal knowledge requirement.  <u>Lemire</u>, 720 F.2d at 1347.

In <u>Scales</u>, a non-expert was permitted to testify concerning a summary of an indictment and a part of the government's proof which was already in evidence.  As the person who supervised the compilation of the summary, the non-expert witness was the proper person to attest to the

---

[13]  While acknowledging that the lines between summary charts and "chaulks" are easily blurred, the First Circuit in <u>Milkiewicz</u> also clarified that "[c]harts admitted under Rule 1006 are explicitly intended to reflect the contents of the documents they summarize and typically are substitutes in evidence for the voluminous originals," whereas "a pedagogical aid [or chaulk] that is allowed under Rule 611(a) to illustrate or clarify a party's position or allowed under Rule 703 to assist expert testimony, may be less neutral in its presentation."  470 F.3d at 397-398.

authenticity and accuracy of the chart.  Scales, 594 F.2d at 563.

"Before admitting such evidentiary presentations, the court must first ensure that each is grounded upon a 'sufficient factual basis,' i.e., upon independently established evidence in the record, and that 'possible prejudice or confusion does not outweigh their usefulness in clarifying the evidence.'" United States v. Sawyer, 85 F.3d 713, 740 (1st Cir. 1995) (citations omitted).  "When a court admits such summaries, '[c]are must be taken to insure that summaries accurately reflect the contents of the underlying documents and do not function as pedagogical devices that unfairly emphasize part of the proponent's proof or create the impression that disputed facts have been conclusively established or that inferences have been directly proved.'" Id, quoting United States v. Drougas, 748 F.2d 8, 25 (1st Cir. 1984).  That a summary may not reflect all activity or may contain gaps, affects its weight rather than the admissibility.  Id.

*        *        *

The government respectfully reserves the right to supplement its trial brief if and as the government becomes aware of additional issues.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    s/Patrick M. Hamilton/
MARK J. BALTHAZARD
PATRICK M. HAMILTON
Assistant U.S. Attorneys
U. S. Attorney's Office
John Joseph Moakley
 United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA  02210
Date: January 16, 2007            (617)748-3100

<u>**CERTIFICATE OF SERVICE**</u>

I, Patrick Hamilton, do hereby certify that a copy of the foregoing was served this date on counsel of record for the defendant via electronic filing.

Date: January 16, 2007                                    _____*s/Patrick Hamilton/*_____
                                                          Patrick M. Hamilton