## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CRIMINAL NO. 03-10363-RCL** |
| **CHUONG VAN DUONG,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The government submits this Sentencing Memorandum to address several issues raised by defendant Chuong Van Duong ("Duong") and by the Presentence Report ("PSR").

## I.    Offense Conduct

Duong is a Vietnamese immigrant to the United States who pleaded guilty to multiple counts of mail fraud and structuring financial transactions. Duong purported to be a successful businessman dealing in the international exchange of commodities as varied as rice, garments, cement, sugar, and recycled goods. He persuaded victims (mostly other Vietnamese immigrants) to invest tens of thousands of dollars in his business activities with the promise that they would reap enormous profits in a short time frame. None of his victims ever received any profits, let alone a repayment of their initial investment. The specifics of Duong's conduct is detailed in the PSR at ¶¶10-166, which the government incorporates herein by reference.

## II.    Computing the Defendant's Advisory Guidelines Sentencing Range

### A.    Role in the Offense:

The government agrees with Probation's assessment that Duong should get a two-level enhancement under U.S.S.G. §3B1.1(c) as an organizer, leader, manager, or supervisor of the criminal offense conduct. PSR ¶ 180. Most of the offense conduct described in the PSR is uncontested by Duong. Duong simply is not being honest or straightforward with the Court when,

in his objections to the PSR, he states that "[t]he investment scheme involved himself, [John] Chang and Kim Vo," as though they were equal partners in that scheme or that "[t]he scheme was hatched and aided and abetted by each of the participants in their own roles."  Defendant's Objection to PSR ¶ 180; see also Objection to ¶18.  Contrary to Duong's assertion that "[t]here is no analysis or basis in fact" for the role-enhancement, the factual basis for such an enhancement is readily found in uncontested portions of the PSR.

For instance, Duong has asserted no objections to ¶¶ 76-85 of the PSR, describing the offense conduct as it related to Joseph Quoc Hai Nguyen ("Joseph Nguyen").  Yet, the first of those paragraphs explains that Joseph Nguyen was active in a Vietnamese community organization in Dorchester; that Kim Vo had joined the organization at Joseph Nguyen's invitation; that Kim Vo had invited Duong to make a presentation to the organization's board of directors; and that this was how Joseph Nguyen first met Duong.  PSR ¶ 76.  Duong invited members of his audience to come see him if they were interested in learning more about his business and Joseph Nguyen accepted this invitation by asking Kim Vo to arrange a follow-up meeting.  PSR ¶¶76-77.  At a subsequent meeting, "Duong introduced Chang to Joseph Nguyen as Duong's business associate and right-hand man . . . ."  PSR ¶78.  Thereafter, more often than not, Joseph Nguyen dealt directly with Duong. PSR ¶¶78-84. Nguyen's account of his dealings with Duong makes it clear that Chang and Vo played supporting roles in the overall offense conduct and acted almost exclusively at Duong's direction.  That same theme recurs in the independent accounts of other investor-victims – the factual accuracy of which Duong also has not challenged.  See, e.g., the account of Tommy Tran at PSR ¶¶110-120.

Furthermore, Duong's own declarations during the course of the offense conduct make it

clear that Chang and Vo operated in a subordinate capacity.  For example, in a series of documents executed by Duong as President of Asia Golden Dragon Corporation ("AGDC") or, in at least one instance, by Kim Vo as AGDC's Vice President, throughout the 1999-2003 time period, Duong *repeatedly* identified Chang as an employee, and specifically as a "clerk", who earned hourly wages ranging between $6.50 and $8.50.  <u>See</u> documents Bates-stamped CVD20898, 20901-20903, 20905-20906, 20908, 20910, 20912-20915, 20917, 20919-20922, 20924-20925 and 20948, copies of which are attached hereto as Exhibits 1A and 1B.

On May 6, 2001, Duong had a meeting with a family of investors: Zung Nguyen ("Zung"), his father Dinh Nguyen ("Dinh")and his mother Pham Thi Hang ("Hang").  Unbeknownst to Duong, that conversation was consensually recorded by Zung, acting under the supervision of the FBI.  <u>Id.</u> The substance of that conversation is summarized at ¶73 of the PSR and Duong has not objected to any aspect of that account, including the description of Duong as having "sent" Chang to Germany to conclude Duong's alleged $1 billion sale of one of his, Duong's, "garment sewing centers."  <u>Id.</u> It is worth underscoring here that, throughout this conversation, Zung and his parents sought to hold Duong accountable for the money they had invested with him.  However, contrary to what one might expect based on Duong's objection to the role-enhancement, Duong barely mentioned either Chang or Vo, except in a passing and subordinate role and he repeatedly (and falsely) told these three victims how phenomenally successful *his* business ventures were proving, just not in connection with the transactions in which they had invested.  <u>See</u>, <u>e.g.</u>, Transcript of May 6, 2001 conversation, at 3 ("**I** sold one of my contracts to Germany, a center estimated around twenty million dollars . . . . **I** sold it for one billion dollars."); 4 ("The company is expanding rapidly.  On the 10th of this month **I** will have its grand opening."); 7 ("**I** have outlets. . . . **I** have contracts. **I** am that big.  And

**I** gave birth to another company, called the Financial Corporation Five. This Financial Corporation is a joint project with President Bush."); 15 ("**I** opened an establishment such as this one, and **I** am doing well. John [Chang] has gone to [the] Federal Republic of Germany and will come back. In a few days **I** will hold a meeting at the grand opening, **I** will hold a general meeting with shareholders to settle all accounts.")(emphasis added), selected pages of which are attached hereto as Exhibit 2.

Similarly, over two years later, on July 28, 2003, Duong had a meeting with what he thought were two representatives of State Street Bank, but one of whom was an undercover FBI agent who recorded the conversation. That meeting is described at ¶¶124-131 of the PSR and Duong has not contested the accuracy of any aspect of that description. Throughout this conversation, Duong again described the business activities in question as **his**, not as **ours**, notwithstanding the fact that Kim Vo was assisting him as interpreter throughout the conversation and notwithstanding the fact that Chang walked in and out of the meeting, usually at Duong's direction. See Transcript of July 28, 2003 conversation at 5 ("**I** need to transfer a billion dollars in foreign currency for investment purposes in the U.S."); 7 (when asked for the name of the person receiving the money, "It's [in] **my** name" and when asked if there will be any other names on the account, Duong replies "No"); 8 (when asked who will have a power of attorney in his absence, Duong replies "[t]he person who could make the decision in my place for me could be Mr. John, my general direct[or]; could also be you [referring to Kim Vo] being my attorney"); and 13 (explaining that, at that time, he had only a few employees working for him on a part-time basis) (emphasis added), selected pages of which are attached hereto as Exhibit 3.

Finally, if the Court is not persuaded by the foregoing that Duong deserves a role-

enhancement, the government is prepared to present at his upcoming sentencing hearing the testimony of David Vu, who reported daily to Duong's office to observe and learn from Duong during the spring and summer of 2003. PSR ¶ 149. He also traveled overseas with Duong, accompanied by Chang, Vo and other investors. PSR ¶¶151-152 and photographs attached to Defendant's Objections to PSR. The government anticipates that David Vu will testify, consistent with the other information set forth in the PSR and above, that Duong was clearly in charge of the business activities in which Vu and his family invested and that Vo and Chang followed his lead.

In short, the government submits that the basis for a role-enhancement for Duong is both ample and compelling.

**B.    The $410,000 Loan to Duong by the Vu Family:**

The government agrees with the defendant that his offense level and Guidelines Sentencing Range ("GSR") are not affected by whether or not a restitution order issued by the Court includes the $410,000 which the government contends Duong borrowed from the Vu family. Defendant's Objection to PSR ¶25. However, in fairness to the Vu family, the government submits that it is important that the full scope of their loss be acknowledged by the Court and that Duong be obligated to repay it in the event that he ever earns or otherwise legitimately obtains any significant sums of money. Furthermore, in a post-<u>Booker</u> world, the Court's view of what constitutes a reasonable sentence could be influenced by whether the loss amount is closer to the $400,000 range of U.S.S.G. §2B1.1(b)(1)(H) or the $1,000,000 range of U.S.S.G. §2B1.1(b)(1)(I).

The Vu family's account of the pertinent events is summarized in the PSR at ¶¶154-158. While David Vu, his brother, Minh Vu, and their mother, Them Thi Tran, were on a business trip to China and Indonesia with Duong (accompanied by Chang and Vo), Duong told the Vus that the

Chinese from whom he was going to borrow $410,000 were going to make millions of dollars and that the Vus could be the ones to realize that enormous profit if they, instead of the Chinese, were to lend him that money. They did so in the form of a $100,000 check dated December 1, 2003 which they made payable to and, at Duong's direction, delivered to Ramlan M. Salleh (PSR ¶¶154-155 and exhibits to Defendant's Objections to PSR) and in the form of a December 12, 2003 wire transfer of $310,000 to a Hong Kong bank account identified to them by Duong (PSR ¶¶156-158).

Duong does not contest the accuracy of the voicemail messages set forth in the PSR in which he directed Minh Vu to "call me back for wiring information for the $310,000" and in which he directed David or Minh to send him a copy of the bank records memorializing the $100,000 and $310,000 transactions. PSR (¶¶157-158). Indeed, Duong admits leaving both voicemails, but claims cryptically that the first message "was a statement made on behalf of Vu and not the defendant." Defendant's Objection to PSR ¶ 157. As for the second voicemail, Duong admits to having made that call from the offices of the Chinese company to whose account he had arranged to have the money wired. Defendant's Objection to PSR ¶158. Duong's suggestion that he had no interest in this two-step transaction is easily rebuttable.

In the first place, it appears that Duong himself wrote by hand the captions to the photographs attached to his objections to the PSR. Under one such photograph, identified as depicting Ramlan M. Salleh, David Vu and Duong, among others, Duong has written "EVERY INVESTOR SOURCING COMPANIES IS DIRECTORS, THEY DISCUSSED ABOUT BUSINESSES DIRECTLY WITH FOREIGNER COMPANIES (THE PICTURE IN INDONESIA PT. ANEKA METAL MULIA CORP)". Exhibits to Defendant's Objections to PSR. In other words, even according to Duong, the $410,000 investment by the Vus was not some side deal of

their own in which he had no involvement.  Rather, this (two-step) $410,000 transaction was precisely the kind of transaction which Duong, when he first lured them into this investment scheme, had promised his investors they would conduct through the subsidiary companies or franchise operations created at his direction, and made available to them thanks to his contacts and business acumen.

Secondly, it is specious for Duong to assert to this Court that he had no direct interest in the affairs of Ramlan M. Salleh ("Salleh") and Pt. Aneka Metal Mulia Corp., the company represented. During the course of the July 28, 2003 meeting with two purported State Street Bank representatives, Duong tried to persuade the bankers that he was on the verge of receiving $1 billion dollars.  He provided the bankers with various documents, including what purported to be a UBS Bank Guarantee for $1 billion to the order of an Indonesian gentleman named Halim Darma Kusuma ("Kusuma"); a UBS Bank Guarantee for $20 billion to the order of and bearing a photograph of Kusuma ; and a letter from Kusuma as Chairman of Pt. Aneka Metal Mulia, a company purporting to specialize in gold bullion and mining, located in Jakarta, Indonesia, to Duong as President of AGDC, indicating that Kusuma's company was "ready, willing and able to issue" the $1 billion bank guarantee "in favor of" AGDC.  PSR ¶124.  The latter letter is signed by Salleh with the indication that he had a "full power of attorney" for Kusuma.  See Exhibit 4 hereto.  The documents also included a photographic transparency of Kusuma in a military uniform.

During that same meeting, Duong made it clear that he enjoyed a close relationship with Kusuma and hoped to conclude in the near future a very lucrative transaction with Kusuma's company.  See Exhibit 3, Transcript of July 28, 2003 conversation at 15 (the $1 billion in the UBS account belongs to the Indonesian government and is "coming from a classmate of mine back then"

who is currently "the security lieutenant general commander in chief in Indonesia" who "invests in a business with me that would be profitable for him, and for me"); 32 (showing the bankers photographs of Kusuma, "the general , who is my close friend," and of "his lawyer," Salleh); 46 (assuring the bankers that "[t]he minute the account is opened I will transfer [the $1 billion] in"); 48 (assuring the bankers that all they have to do is submit the bank warranty to UBS and "the money comes through"). See also July 21, 2003 Bullion Sale and Purchase Agreement between AGDC and Pt. Aneka for the sale of 2,000 metric tons of gold bullion to AGDC signed by Salleh and Chuong (Bates-stamped CVD28529-28543), a copy of which is attached hereto as Exhibits 5A and 5B ; July 21, 2003 International Donation Contract for Hospital Project signed by Chuong and Salleh and purporting to memorialize Pt. Aneka's pledge to donate $500 million to International Help Charities Corp., one of Duong's companies, a copy of which is attached hereto as Exhibit 6; and July 21, 2003 Full Power of Attorney signed by Salleh, who is identified as a "Director, Advisor & Trustee" for Pt. Aneka[1], a copy of which is attached hereto as Exhibit 7.

If the foregoing is not sufficient to persuade the Court that Duong should be held accountable for the full $510,000 investment made by the Vu family, the government is prepared to present at Duong's sentencing hearing the testimony of Minh and David Vu.

### C.    Acceptance of Responsibility:

For the reasons more fully set forth in the government's objection to ¶169 of the initial PSR, and for the additional reasons set forth below, Duong should not be awarded a two-level reduction

---

[1]  This is almost verbatim the description of Salleh's role provided by Duong in his handwritten caption for one of the photographs attached as exhibits to his objections to the PSR.

in his offense level for acceptance of responsibility.[2]  The government submits that, at no time throughout the various proceedings in this matter, has Duong expressed the slightest remorse or accepted any responsibility for losing hundreds of thousands of dollars in investors' money on fantastic business ventures, let alone accepting responsibility for knowingly defrauding his numerous victims.  Even if Duong has begun to believe his own lies about his wildly successful worldwide business operations, it is not a basis for granting him a two-level reduction for acceptance of responsibility.  See United States v. Burns, 925 F.2d 18, 21 (1st Cir. 1991) (affirming the district court's denial of acceptance of responsibility where the district court found, *inter alia*, that the defendant, like Duong, "is as much self deceptive as he is deceptive of others with respect to the significance of what he is doing and I believe his motivations for doing it").

Moreover, if this Court finds that Duong was an organizer or leader in connection with the offense conduct or in fact had a stake in the $410,000 which the Vu family loaned to Duong, the government submits that the Court should deny Duong a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. §3E1.1, comment. n.1(a) ("a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility").  That would constitute a separate and independently sufficient basis for denying Duong any offense reduction based on acceptance of responsibility.

**D.    Vulnerable Victims:**

Although the government did not suggest this enhancement in its submission to the Probation

---

[2]  Everyone seems to agree that Duong should not be considered for a three-level reduction in light of the fact that his Alford plea was not offered until the very eve of trial. Indeed, no one, not even defense counsel, knew if Duong would or could successfully complete a plea colloquoy in light of the reasons he had given for balking just before a plea hearing approximately six months earlier.

Office, it agrees that the Court should impose it for the reasons set forth in the PSR at ¶181 and in the Addendum response to Objection #17 at pg. 78-79.

### E.    Diminished Capacity:

The government submits that Duong should not be granted a departure pursuant to U.S.S.G. §5K2.13 (as he argues) or a post-<u>Booker</u> variance from a Guidelines sentence on the grounds that he suffers from some form of diminished capacity.  In the first place, the defendant has excerpted out of context the words of two psychiatrists to make it seem as though they believed that Duong suffered from some form of mental illness.  In fact, the two specialists who found Duong competent to stand trial also found that Duong had lied to them about various aspects of his background.  <u>See</u> Competency to Stand Trial Evaluation at 3, 4 and 6-7, a copy of which was attached as an exhibit to Defendant's Objections to PSR.  The evaluators opined that "[t]he grandiosity exhibited by Mr. Duong may arise in several circumstances" and went on to offer three possible explanations for the grandiose lies told by Duong.  <u>Id.</u> at 7.  The evaluators speculated that Duong might "simply [be] telling falsehoods with the intent of deceiving all concerned"; might be suffering from "a Delusional Disorder, Grandiose type," which they described as a "psychotic disorder"; or might have "a condition commonly known as pseudologica fantastica, a form of pathological lying," which they described as "associated with personality disorders, as opposed to major mental illness. . . ."  <u>Id.</u> at 7.  The evaluators went on to say that "[a] determination of the actual cause of Mr. Duong['s] grandiosity will require more extensive investigation of his past behavior, further clinical interviews, and psychological assessment."  <u>Id.</u>

In the 15 months since the evaluators submitted their report, Duong and his counsel have shown no interest in pursuing "[a] determination of the *actual cause* of Mr. Duong['s] grandiosity"

(emphasis added).  Instead, in Defendant's Objection to ¶267 of the initial PSR, Duong seeks to "cherry-pick" the evaluators' report to suggest that Duong "had a significantly impaired ability to understand the wrongfulness of his behavior at the time of the offense."  It should be remembered that Duong bears the burden of establishing by a preponderance of the evidence that he suffers from some form of diminished capacity.  Yet, he has offered no explanation why this Court should reject one possible explanation offered by the evaluators -- namely, that Duong is an inveterate liar -- in favor of another possible explanation -- that he is driven by a personality disorder.

Moreover, as more fully argued below, Duong's assertion that he (may) suffer from a personality disorder or some other form of diminished capacity is (if believed) a compelling justification not for reducing his sentence but for fashioning a sentence that employs both imprisonment and supervised release to incapacitate Duong for as long as possible.  As Duong himself seems to acknowledge, he is dead-set on returning to the very business exploits which led to his instant conviction (see Defendant's Objection to ¶ 267 ("To this day, Mr. Duong believes he is going to create a recycling program that will change the world")) and it is incumbent on this Court to stop him and to protect the public from him.

*     *     *     *

Based on all the foregoing, the government submits that Duong's Total Offense Level is 28 and that his Guidelines Sentencing Range is 78-97 months.

## III.     Government's Sentencing Recommendation

The government submits that incarceration for a  period of time equal to at least the low end of the applicable GSR (78-97 months), to be followed by a three-year period of supervised release is a reasonable sentence which best takes into account the sentencing factors enumerated in 18

11

U.S.C. §3553(a).

Duong defrauded roughly two-dozen hard-working, yet naive and trusting, fellow Vietnamese immigrants out of hundreds of thousands of dollars. Unfortunately, most (but certainly not all) of his victims now understand that it is highly unlikely they will ever receive back from Duong even a small portion of the monies he accepted from them, notwithstanding the restitution order which the government urges this Court to issue against Duong. In short, the trust Duong violated and the dreams he shattered warrant in their own right a significant prison term.

However, the primary justifications for the sentence recommended by the government in this matter are the need to reflect the seriousness of the offense; the need to afford adequate deterrence to criminal conduct; and, above all else, the need to protect the public from further crimes of the defendant. It is apparent that Duong still contends, at least publicly, that he did nothing wrong. If this Court does not impose on Duong a substantial period of incarceration, especially in the wake of his Alford plea, it is very likely that Duong will try to persuade all who will listen that this Court agrees with him, that his prosecution was, after all, just a big mistake committed by over-zealous prosecutors who could not possibly understand the complicated business transactions in which Duong had been engaged. Conversely, the imposition of a significant prison sentence above and beyond the 29 months Duong served in pre-trial detention will send a message to the immigrant community upon whom Duong preyed that Duong in fact is and was a criminal and is someone who should not be trusted in the future with hard-earned fruits of other people's labors. A significant additional prison sentence also will send a meaningful deterrent message to other individuals tempted to engage in similar patterns of so-called "affinity fraud."

It is clear at this point that Duong fully intends to return to the same course of conduct which

led him to this point.  In 2006, Duong balked at entering even an <u>Alford</u> plea because, as his counsel

then explained to the Court, Duong (correctly) feared that the terms of his supervised release would

interfere with the conduct of his international business.  In his interview with the Probation Office,

Duong acknowledged that he "hopes to obtain his freedom, continue his charity work . . . [and h]e

also hopes to continue 'clean[ing] up the world' via an international recycling program."[3]  PSR ¶210.

Duong's friend and third-party custodian (who also invested money with Duong prior to Duong's

incarceration), Ms. Tran, also "is aware that the defendant hopes to do charity work in the future and

she plans to join him in his business ventures."  PSR ¶ 208.  Yet another former investor and "close

friend of the defendant, Jane Tremblay, . . . is supportive of the defendant and will assist him in any

way that she can."  PSR ¶ 209.

     Therefore, the government urges the Court to impose on Duong the following special

conditions of supervised release:

> The defendant shall secure and maintain full-time employment in which he is paid
> hourly wages, and shall provide the Probation Office with copies of his pay stubs or
> other verification of his employment as directed by the Probation Office.

> The defendant is prohibited from, directly or indirectly, working for, accepting
> compensation from, or participating in the affairs of any person, enterprise or entity
> which solicits or accepts sums of money from third parties in the form of an
> investment, a donation, or as the purchase price for a franchise.

     These proposed conditions, if imposed by the Court, will be effective at incapacitating

Duong only to the extent that the Probation Office is vigilant in making sure that Duong has not

concocted a new scheme which, in some narrow way, differs from the generic prohibition proposed

---

[3]  It should be underscored here that Duong is clearly referencing so-called "charity"
work and "recycling" initiatives which increasingly became the focus of his purported business
activities in the latter half of 2003,  prior to his arrest.  <u>See</u> <u>supra</u>, at pg. 8 and Exhibit 6.

above.  Even so, these limitations will only be in effect for a maximum of three years after Duong's release from any prison term imposed.  Duong is just 58 years old and, since 29 months of pre-trial confinement apparently have not deterred him from returning to his past line of "work," there is no reason to believe that 3 years of supervised release will have any lasting deterrent impact.

Therefore, the government submits that the only reasonable (and reasonably effective) way of incapacitating Duong for a more meaningful period of time is to impose on Duong a  period of incarceration within the applicable GSR, to be followed by the maximum term of supervised release. The defendant's incapacitation is all the more critical if, as either Duong and/or his counsel now contend, Duong suffers from some form of disorder which renders him delusional enough to be dangerous to himself and to (the most vulnerable members of) the public but not delusional enough to have an affirmative defense to the offenses of conviction.  Whether viewed as a highly accomplished scam artist or as a self-deluded businessman with visions of grandeur, Duong is committed to pursuing the same line of activity as before and must be prevented from preying upon a new set of victims.

The government also urges this Court to issue an order of restitution identifying the victims and amounts of money set forth in ¶ 25 of the PSR.  Candidly, the government has no illusions that the victims in question will ever recoup any meaningful restitution from the defendant.  After all, when his efforts were not focused on his purported international import-export business and when he was not living off of his victims' investments, Duong was able to secure jobs paying only the minimum wage.  See PSR ¶¶ 236-237 and the government's objections to same.  Nevertheless, the government views an $854,110 restitution order as further evidence to the world at large of Duong's criminality and as another possible (albeit sleight) impediment to his successful resumption of the

same line of business.

                                                Respectfully submitted,

                                                MICHAEL J. SULLIVAN
                                                United States Attorney

                      By:    *s/Patrick M. Hamilton*
                                                MARK J. BALTHAZARD
                                                PATRICK M. HAMILTON
                                                Assistant U.S. Attorneys
                                                U. S. Attorney's Office
                                                John Joseph Moakley
                                                   United States Courthouse
                                                1 Courthouse Way, Suite 9200
                                                Boston, MA  02210
Date: May 30, 2007                                   (617)748-3100


<u>Certificate of Service</u>

     I hereby certify that on May 30, 2007, this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                                /s/ Mark J. Balthazard
                                                MARK J. BALTHAZARD
                                              Assistant U.S. Attorney